UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

G.D.M., a minor, by and through his
Parents, T.E.M. and N.F.M.,

     Plaintiffs,

v.                      CASE NO.: 6:23-cv-01857-RBD-LHP

CITY OF OVIEDO, a Florida municipal
Corporation; SCOTT MOSELEY; and
YASHIRA MONCADA,

     Defendants.

_____/

## MOTION TO DISMISS AMENDED COMPLAINT, WITH PREJUDICE, BY DEFENDANTS MOSELEY AND MONCADA

Defendants SCOTT MOSELEY and YASHIRA MONCADA, by and through undersigned counsel and pursuant to the provisions of Federal Rules of Civil Procedure 12(b)(6), 12(d), and 56, and Local Rule 3.01, move the Court for entry of an Order dismissing the Plaintiff's Amended Complaint, with prejudice, and in support state:

1.    Plaintiff filed a Complaint on September 27, 2023, against the City of Oviedo, Scott Moseley, and Yashira Moncada. (Doc. 1). The claims stem from an incident involving Plaintiff, a minor, at Stenstrom Elementary School on February 2, 2023. Defendants Moseley and Moncada filed a Motion to Dismiss in response to the original Complaint. (Doc. 21).

2.      The Court held a hearing on the Motion to Dismiss, as well as on the City of Oviedo's Motion to Dismiss, on April 3, 2024 (Doc. 37).  The Court indicated that the Motion to Dismiss would be denied, and that an "Order [was] to follow" (*id.*).

3.      On April 9, 2024, Plaintiff filed an Amended Complaint. (Doc. 38).  The claims in the Amended Complaint are as follows:  excessive use of force against Moncada, individually under 42 U.S.C. § 1983; excessive use of force against Moseley, individually, under 42 U.S.C. § 1983; battery/unnecessary force against City of Oviedo; and liability of City of Oviedo under Fla. Stat. 768.28.  (Doc. 38).[1]

4.      The § 1983 excessive use of force claim against Moncada in Count I is due to be dismissed for failure to state a claim.  The facts of the case show that the use of force was not constitutionally unreasonable.

5.      The § 1983 excessive use of force claim against Moseley in Count II is due to be dismissed for failure to state a claim.  The facts of the case show that the use of force was not constitutionally unreasonable.

6.      Moncada and Moseley are each independently entitled to qualified immunity as to the § 1983 excessive use of force claims against them in their individual capacities.  Moreover, if the Amended Complaint fails to allege facts showing that the immunity is overcome, each officer is entitled to a ruling on that immunity at the

---

[1] The Court subsequently entered an Endorsed Order denying the City's Motion to Dismiss (Doc. 21) as moot in light of the Amended Complaint and indicated that "it has not yet made a ruling on qualified immunity" as to the officers. (Doc. 38).  Defendants Moseley and Moncada filed a Motion for Clarification of Order on Motion to Dismiss on April 19, 2024. (Doc. 40).

pleadings stage, prior to having to undertake the expense, burden, and distraction of discovery.

7.     Local Rule 3.01(g) Certification: Undersigned counsel certifies she conferred with Plaintiff's counsel.  Plaintiffs do not agree to the motion.

WHEREFORE, Defendants Moseley and Moncada request the Court enter an Order granting Defendants' Motion to Dismiss Amended Complaint, with Prejudice.

## MEMORANDUM OF LAW

Pursuant to Local Rule 3.01(a), Defendants Moseley and Moncada submit the following Memorandum of Law in support of this motion.

## I.     Motion to dismiss under Rule 12(b)(6) and incorporation by reference.

A motion to dismiss pursuant to Rule 12(b)(6) "is a motion attacking the legal sufficiency of the complaint." *Haddad v. Dudek*, 784 F. Supp. Ed 1303, 1313-14 (M.D. Fla. 2011) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).   "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. *Twombly*, 550 U.S. at 570.

While a district court is generally limited to considering pleadings and any exhibits attached to it when considering a motion to dismiss, a court may consider and rely upon "documents incorporated into the complaint by reference".  *See Baker v. City of Madison, Alabama, et al.*, 67 F.4th 1268, 1277 (11th Cir. 2023) (citing *Grossman v.*

*Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2008)).  In concluding that the incorporation-by-reference doctrine was satisfied in *Baker*, the Eleventh Circuit determined (1) that the bodyworn camera footage at issue was referenced in the complaint, (2) that the footage depicted events central to the plaintiff's claim, and (3) that the footage was undisputed because the plaintiff did not challenge its authenticity. *Baker*, 67 F.4th at 1276 (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002), and *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)).  "Evidence is 'undisputed' in this context if its authenticity is unchallenged." *Baker*, 67 F.4th at 1276 (quoting *Horsley*, 304 F.3d at 1134)).

Plaintiff refers to Moncada's bodyworn camera footage several times throughout the Complaint.  (Doc. 38, ¶ 22-28).  The footage portrays events central to Plaintiff's claim, as it captures the entirety of the alleged excessive use of force incident. (*See, id.*).  Plaintiff does not challenge the authenticity of the bodyworn camera footage of his arrest—he cites it in support of his allegations.  (*Id.*).

The bodyworn camera footage of Moncada shows all the relevant conduct of Moncada regarding this incident with Plaintiff.  Defendants request that this Court rely on the bodyworn camera footage of Moncada in ruling on this Motion, as it has been incorporated into the Amended Complaint by reference.

## II.  <u>Allegations in the Amended Complaint regarding Moseley and Moncada.</u>

Plaintiff was a student at Stenstrom Elementary School.  (Doc. 38, ¶ 17).  As alleged in the Complaint, Plaintiff had both an Individual Educational Plan ("IEP") and a Behavioral Intervention Plan ("BIP") in place due his behavioral problem of

"physical aggression", which was identified as "hitting, kicking, pushing, throwing items and property destruction." (*Id.*, ¶ 19).  According to Plaintiff, the BIP directed *school personnel* to not engage in any conversation with him and limit the level of attention directed to him when confronted with his physical aggression. (*Id.*).

On February 2, 2023, Plaintiff began "exhibiting the physical aggression that was addressed in his BIP", and school personnel allegedly redirected Plaintiff to the school's mailroom, using "Ukeru mats to block his physical aggression." (*Id.*, ¶ 20). While in the mailroom, Moncada arrived and turned on her bodyworn camera. (*Id.*, ¶ 22). Moncada attempted to engage Plaintiff and as alleged in the Complaint, asked Plaintiff if he wanted to go to jail. (*Id.*).  Plaintiff alleges that the Certified School Counselor (unnamed) told Moncada not to handcuff Plaintiff. (*Id.*, ¶ 24).

Plaintiff alleges that Moncada eventually called for backup, and Moseley arrived. (*Id.*, ¶ 23).  Moseley advised he was going to handcuff Plaintiff, to which Moncada advised, "You can do that, I can't." (*Id.*).  Plaintiff alleges that Moseley proceeded to handcuff Plaintiff behind his back and placed him on the floor. (*Id.*, ¶ 25).  As Plaintiff was being handcuffed, an unnamed school employee said, "I don't think you can do that," to which Moncada responded, "He can do that because he is on the road." (*Id.*, ¶ 26).

Plaintiff alleges that as he was handcuffed, Moncada "continue[d] to engage him. (*Id.*, ¶ 27).  Plaintiff further alleges that he said he wanted to go home and that Moncada responded, "You're not going to go home, so do you want to go to jail?"

(*Id.*).  Plaintiff further alleges that Moseley "attempt[ed] to lift up [Plaintiff] while holding [Plaintiff's] hands, which [were] behind his back, causing [Plaintiff] to yell out in pain."  (*Id.*, ¶ 28).

As part of the Amended Complaint, Plaintiff references an agreement called "CITY OF OVIEDO/SCHOOL BOARD OF SEMINOLE COUNTY, FLORIDA SRO AGREEMENT 2022-2023" (hereinafter "SRO Agreement").  (*Id.*, ¶ 11). Plaintiff alleges the City of Oviedo agreed to provide school resource officers ("SROs") to Seminole County public schools and that Moncada was serving as the SRO at Stenstrom Elementary School on the date of the alleged incident.  (*Id.*, ¶ 12).

Plaintiff points to various provisions of the SRO agreement in the Amended Complaint, which states that "[t]he [school resource officer] will not use mechanical devises to restrain students with disabilities except such devises may be used in grades 6 through 12 in accordance with F.S. 1003.573.  Handcuffs are considered mechanical restraints."  (*Id.*, ¶ 16).   Plaintiff also points to the IEP and the BIP in place for him. (*Id.*, ¶ 19).  Plaintiff alleges that the BIP identified that "physical aggression" was a behavioral problem of Plaintiff, defined as "hitting, kicking, pushing, throwing items and property destruction."  (*Id.*).

### III.   Moncada's bodyworn camera footage of the incident.

Moncada's bodyworn camera footage captures the entirety of the use of force incident involving each of them, as alleged by Plaintiff in the Complaint.[2]  Moncada's

---

[2] Any timestamp references to Moncada's bodyworn camera footage will be according to the timestamp in the top, right-hand corner of the footage.

bodyworn camera footage was previously filed under seal with leave of Court.  (*See* Doc. 20, 22, 24).

Moncada stood in the mailroom as Plaintiff was on the ground, with three school employees in the room.  (Doc. 22, Moncada BWC, 09:52:54 – 09:53:00). Plaintiff threw a paper/item at the television by the wall.  (*Id.* at 09:52:54).  Plaintiff threw a paper behind him in the direction of where Moncada was, then threw a paper directly at Moncada.  (*Id.* at 09:52:59 – 09:53:02).  Plaintiff tossed another paper toward Moncada.  (*Id.* at 09:53:05).  Plaintiff then began crawling toward a blue paper on the ground, picked it up, and flung it toward Moncada.  (*Id.* at 09:53:09 – 09:53:31).

Plaintiff crawled toward another set of papers, grabbed a stack, and threw it at Moncada as she approached him.  (*Id.* at 09:53:35 – 09:53:40).  Plaintiff grabbed more papers and threw them at Moncada.  (*Id.* at 09:53:44).  Plaintiff, yet again, grabbed more paper and threw them toward Moncada.  (*Id.* at 09:53:48).

As he was approached by a green-shirted school employee, Plaintiff balled up a piece of paper and threw it at Moncada.  (*Id.* at 09:53:49 – 09:53:52).  Plaintiff then grabbed a stack of papers from the mailbox and tossed those toward Moncada.  (*Id.* at 09:53:58).  Another school employee, wearing a black shirt, approached Plaintiff and stood between him and the mailbox while holding a Ukeru mat.  (*Id.* at 09:54:00 – 09:54:15).  Plaintiff balled up another piece of paper and threw it at the black-shirted school employee.  (*Id.* at 09:54:16).  Plaintiff then picked up two more pieces of paper and threw them towards Moncada in succession.  (*Id.* at 09:54:22 – 09:54:24).  After

pushing a book behind him, Plaintiff tossed more paper at Moncada and around the room.  (*Id.* at 09:54:28 – 09:54:33).

Moncada approached Plaintiff; Plaintiff told her not to step on him  (*Id.* at 09:54:37 – 09:54:38).  Plaintiff raised his right hand and hit Moncada while shouting, "Fuck you, bitch!"  (*Id.* at 09:54:40 – 09:54:43).  Plaintiff then threw more paper at Moncada.  (*Id.* at 09:54:4 – 09:54:50).

From where he was sitting, Plaintiff brought down a basket full of books from a low shelf.  (*Id.* at 09:54:50).  Plaintiff picked up a book from this basket and threw it aimlessly.  (*Id.* at 09:54:52).  Both school employees used Ukeru mats to deflect the items before the black-shirted school employee moved the book basket; Plaintiff then began hitting the Ukeru mat.  (*Id.* at 09:54:52 – 09:54:56).  Plaintiff began pulling on a desk before he was blocked by school employees.  (*Id.* at 09:55:03 – 09:55:05).  Plaintiff then grabbed the Ukeru mat of the black-shirted school employee, pulled the mat away from her, and continued to kick her as she blocked his aggression with the Ukeru mat. (*Id.* at 09:55:05 – 09:55:16).  Plaintiff then grabbed the Ukeru mat held by the green-shirted school employee and tried to kick her.  (*Id.* at 09:55:18 – 09:55:24).

Plaintiff began moving toward the mailboxes in the room; the black-shirted school employee attempted to block his access with the Ukeru mat.  (*Id.* at 09:55:32). Plaintiff grabbed papers from the mailboxes and threw them up toward the ceiling. (*Id.* at 09:55:34).  Plaintiff then hit the black-shirted school employee twice in the shin

with his fists.  (*Id.* at 09:55:36).  Plaintiff tried to hit her a third time but was blocked by a Ukeru mat being held by the green-shirted school employee.  (*Id.* at 09:55:37).

Moncada walked toward the door, and Moseley entered the room.  (*Id.* at 09:56:00 – 09:56:02)  As Moseley came through the door, Plaintiff was tossing papers around the room.  (*Id.* at 09:56:02).  As Moncada and Moseley walked toward the back of the room, Plaintiff continued tossing paper in Moncada's direction, in the direction of the door, toward the center of the room, and toward school employees. (*Id.* 9:56:02 – 09:56:25).  Plaintiff began slamming the door of a cupboard.  (*Id.* at 9:56:24 – 9:56:32).  He subsequently crawled toward a bright yellow, plastic, "wet floor" caution sign.  (*Id.* at 9:56:32 – 9:56:34).

As Moncada and Moseley discussed the situation, Moncada advised that Plaintiff had been "throwing books at us."  (*Id.* at 09:56:27).  Plaintiff picked up the bright yellow, plastic, "wet floor" caution sign and threw it toward Moseley and Moncada.  (*Id.* at 09:56:34-37).  Six seconds later, Plaintiff threw a book at Moseley. (*Id.* at 09:56:37 – 09:56:43).  Moseley advised Moncada that he was going to handcuff Plaintiff.  (*Id.* at 09:56:48 – 09:56:51).

As Moseley walked toward Plaintiff, Plaintiff continued to throw papers at the officer.  (*Id.* at 09:56:47 – 09:56:50).  Moseley asked  Plaintiff, "Can you stand up for me, bud?"; Moseley was able to place the handcuffs on Plaintiff with Moncada's assistance.  (*Id.* at 09:56:49 – 09:57:03).   Someone off-camera stated, "I don't think

we can do that," to which Moncada responded, "He can do that since he's on the road." (*Id.* at 09:57:00 – 09:57:02).

Plaintiff laid on the ground and started kicking Moseley's legs. (*Id.* at 09:57:03 – 09:57:06). Moseley had to hold Plaintiff's left leg to stop the kicking while telling Plaintiff "chill", "stop it", and "sit up". (*Id.* at 09:57:06 – 09:57:24). As Moseley was attempting to sit Plaintiff up, Plaintiff yelled out, "Fuck you bitch!" (*Id.* at 09:57:10 – 09:57:13). Moncada told Plaintiff that if he relaxed, they could take the handcuffs off. (*Id.* at 09:57:15 – 09:57:20). Moseley told Plaintiff to chill as he sat Plaintiff upright, to which Plaintiff responded, "Get me out of these fucking handcuffs bitch!" (*Id.* at 09:57:15 – 09:57:22). Moseley again told Plaintiff, "You need to chill." (*Id.* at 09:57:23 – 09:57:28).

Moncada advised Plaintiff that if he stopped throwing things they could take the handcuffs off, to which Plaintiff responded, "Shut the fuck up bitch! Let me fucking go!" (*Id.* at 09:57:26 – 09:57:44). Plaintiff was moving his arms in the handcuffs while going back-and-forth with Moncada, telling Moncada to "shut the fuck up" and "fuck you" and calling her a "fucking asshole". (*Id.* at 09:57:40 – 09:58:49). Moncada told Plaintiff that what he was doing was dangerous, as he was hitting staff, hitting Moncada, throwing things, and putting everyone in the room in danger. (*Id.* at 09:57:40 – 09:58:01). Moseley told Plaintiff, "Stop pulling," and, "Stop picking at my hands." (*Id.* at 09:58:00 – 09:58:09). Moncada reiterated that she was asking Plaintiff to relax so that the handcuffs could be taken off. (*Id.* at 09:58:10 – 09:58:15).

Plaintiff and Moncada continued to speak to each other back-and-forth; Plaintiff continued to squirm and kept trying to pick at the handcuffs and get out of the handcuffs.  (*Id.* at 09:59:34 – 10:00:46).  Plaintiff continued to pull away from Moseley while saying, "Ow!"; Moncada told Plaintiff, "If you can relax we can take the cuffs off, but you're literally endangering everybody here by hitting everybody. And they don't come to work to get beat up. They come to work to keep you safe and teach you."  (*Id.* at 09:59:39 – 09:59:51).  Plaintiff responded with, "Fuck you," before continuing to pull against the handcuffs and away from Moseley.  (*Id.* at 09:59:51 – 10:00:05).  As Plaintiff was trying to get the handcuffs off, Moseley said to him, "You're going to hurt yourself. Stop."  (*Id.*  10:00:23 – 10:00:31).  As she spoke with Plaintiff, Moncada reiterated that Plaintiff was "hitting everybody."  (*Id.* at 10:00:45 – 10:00:55).

Plaintiff continued pulling away from Moseley.  (*Id*. at 10:00:31 – 10:01:34).  Moseley told Plaintiff, "Quit trying to claw me. It's going to get real uncomfortable if you keep doing that. I'm not going to let you hurt me. You are not gonna hurt me."  (*Id.* at 10:01:28 – 10:01:3).  As Moseley was speaking, Plaintiff yelled out, "I'm trying to just get out of the fucking cuffs you bitch!"  (*Id.* at 10:01:25 – 10:01:39).  Moseley told Plaintiff, "Keep your nails away from me."  (*Id.* at 10:01:25 – 10:01:59).  Plaintiff said he was just trying to get the cuffs, to which Moseley responded, "You keep clawing me."  (*Id.* at 10:01:40 – 10:01:59).  Moncada explained that if he continued to try to get the handcuffs, that Plaintiff would get hurt more.  (*Id.* at 10:01:50 – 10:01:59).

Plaintiff and Moncada continued speaking back-and-forth as he kept pulling away from Moseley.  (*Id.* at 10:01:55 – 10:03:00).  Plaintiff brought his legs to a kneeling position and attempted to stand up before Moseley moved him and stated, "Stop trying to stand up."  (*Id.* at 10:02:40 – 10:02:52).  Plaintiff ignored Moseley's instruction not to stand up and attempted to do so a second time; Moseley again told Plaintiff, "Stop trying to stand up." (*Id.* at 10:02:52 – 10:03:15).  Plaintiff responded with, "No." (*Id.*).  Moncada asked Plaintiff if they could sit him down; Plaintiff again responded with, "No." (*Id.* at 10:01:01 – 10:03:06).

Plaintiff was briefly placed in a sitting position before he moved and laid on the floor.  (*Id.* at 10:03:06 – 10:03:31).  Plaintiff again fiddled with his handcuffs while speaking with Moncada, Moseley, and school employees. (*Id.* at 10:03:30 – 10:06:03).  As he was fiddling with the handcuffs on the ground, Moncada and Plaintiff had this exchange:

| | |
|---|---|
| Moncada: | [Plaintiff], it's not okay to hit a police. |
| Plaintiff: | I don't care. |
| Moncada: | I know you don't care, but you can go to jail for things like that. And I don't wanna see you go to jail for things like that, okay? You can get in trouble for hitting staff, too. |
| Plaintiff: | I don't care, I've done it since pre-K. |
| Moncada: | That's not nice. Why do you do those things? |
| Plaintiff: | Because these fucking teachers are fucking assholes. |

(*Id.* at 10:04:07 – 10:04:45).  Plaintiff was advised several times that if he were to relax, that the handcuffs could be taken off.  (*Id.* at 09:58:06 – 09:58:17; 09:59:39 – 09:59:51; 09:59:51 – 10:00:05; 10:01:02 – 10:01:39; 10:01:53 – 10:02:19; 10:02:20 – 10:02:58; 10:06:31 – 10:07:11).   School employees continued to speak with Plaintiff and attempted to calm him down.  (*Id.* at 10:05:07 – 10:09:50).

After Plaintiff spoke with school employees and sat up, Moseley removed Plaintiff's handcuffs.  (*Id.* at 10:09:51 – 10:10:02).  After the handcuffs were removed, Plaintiff immediately balled his hands into a fist and began hitting himself, first his body and then his head.  (*Id.* at 10:10:05 – 10:10:20).  Plaintiff was eventually walked out of the room by school personnel.  (*Id.* at 10:14:20 – 10:14:36).

**IV.**   <u>**Qualified immunity analysis and Plaintiff's burden to overcome it.**</u>

In Counts I and II, Plaintiff brings §1983 claims against Moseley and Moncada, respectively, for excessive use of force.   Plaintiff mentions both the Fourth and Fourteenth Amendments as a basis for such claims, but it is well-settled that claims for excessive use of force by a law enforcement officer are governed by the reasonableness standard of the Fourth Amendment, and not by a generalized notion of due process under the Fourteenth Amendment.  "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395 (1989).  The due process aspect of use of force is

relevant only where force is used after an arrest has actually been completed. *See also Garrett v. Athens–Clarke County,* 378 F.3d 1274, 1279 n.11 (11th Cir. 2004) (quoting *Gutierrez v. City of San Antonio,* 139 F.3d 441, 452 (5th Cir. 1998), for the proposition that "Fourteenth Amendment analysis does not begin until *after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time") (internal quotation marks omitted). As none of those aspects of force apply in this situation, the claim is governed by the Fourth Amendment, not the Fourteenth.

The officers in this motion assert entitlement to qualified immunity. "As we have often observed, '[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *McCullough v. Antolini*, 559 F.3d 1202, 1205 (11th Cir. 2009) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002)). The purpose of qualified immunity is to allow officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987), "protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee*, 284 F.3d at 1194 (internal citation and quotation marks omitted).

"Because qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation,' [ ] questions of qualified immunity must be resolved 'at the earliest possible stage in litigation.'" *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th

14

Cir. 2003) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) and *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).  "It is therefore appropriate for a district court to grant the defense of qualified immunity at the motion to dismiss stage if the complaint fails to allege the violation of a clearly established constitutional right." *Gonzalez*, 325 F.3d at 1233 (citing *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001)).

"[T]o receive qualified immunity, an official must first establish that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *McCullough*, 559 F.3d at 1205 (quoting *Lee*, 284 F.3d at 1194).  If the official was acting within the scope of his discretionary authority, then "the burden then shifts to the plaintiff that the grant of qualified immunity is inappropriate." *Id*. Each individual defendant "is entitled to a separate analysis of the applicability of the qualified immunity doctrine to his actions." *Young v. Eslinger,* 244 Fed. Appx. 278, 279 (11th Cir. 2007).

To overcome the defense of qualified immunity, a plaintiff must show (1) that the defendant violated a constitutional right, and (2) that the right was clearly-established at the time of the alleged constitutional violation. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Barnes v. Zaccari*, 669 F.3d 1295, 1202 (11th Cir. 2012).  The Court may analyze these two elements in whichever order it deems appropriate. *Pearson v. Callahan*, 55 U.S. 223, 236 (2009).  If a plaintiff cannot establish both elements to satisfy his burden,

the defendants are entitled to qualified immunity. *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010).

For a right to be clearly-established, it must be "sufficiently clear that every reasonable official would [have understood] that what he is doing violated that right . . . . In other words, existing precedent must have placed the statutory or constitutional question beyond debate. *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations and quotation marks omitted) (alteration in original).

"Clearly established law" means that (1) "a materially similar case has already been decided"; (2) "a broader, clearly established principle that should control the novel facts of the situation"; or (3) "the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary." *Gaines v. Wardynski*, 871 F.3d 1203, 1208-09 (11th Cir. 2017) (citations omitted); *see also Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008); *Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 826 n.4 (11th Cir. 1997) ("In this circuit, the law can be clearly established for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose.") (internal quotations omitted).

A defendant must have fair notice of the unconstitutionality of his or her conduct deriving from (1) constitutional or statutory language; (2) broad holdings or statements of principle in case law not tied to particularized facts; or (3) fact-specific judicial precedent. *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1350-52 (11th Cir. 2002)).

Plaintiff does not dispute that Moncada and Moseley were acting within the scope of their discretionary capacity as government officials. (*See* Doc. 38, ¶¶ 8-10, 13-14, 21, 37, 41). Therefore, the burden shifts to Plaintiff to overcome qualified immunity by demonstrating that Moncada and Moseley violated a clearly-established constitutional right at the time of the alleged violation. *See Skop*, 485 F.3d at 1137. Plaintiff has to allege facts overcoming qualified immunity. *See McCullough*, 559 F.3d at 1205. Between the Amended Complaint and Officer Moncada's video, which has been incorporated by reference to the Amended Complaint, Plaintiff falls well-short of overcoming Moseley's and Moncada's defense of qualified immunity. The officers are entitled to the immunity now, at the motion to dismiss stage, because Plaintiff has not alleged facts overcoming the immunity.

**V.**   **The SRO Agreement and BIP do not create a constitutional right as to use of force beyond the Fourth Amendment's reasonableness standard, nor do they define the clearly established law as to use of force.**

Plaintiff points to the SRO Agreement, as well as the BIP, in order to establish that there was a constitutional violation. (Doc. 38, ¶¶ 11-16). This is insufficient to demonstrate that a right was violated or clearly-established. Neither the SRO Agreement nor the BIP define the Fourth Amendment right to be free from excessive force. Such an agreement or plan does not define a constitutional right beyond the Fourth Amendment, nor does it clearly-establish the reasonableness of a given use of force.

"To state a claim under section § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States." *West v. Atkins*, 487

U.S. 42, 48 (1988). Courts have routinely found that infringement of agency rules, regulations, policies, or procedures do not, without more, amount to constitutional violations. *See, generally, Sandin v. Conner*, 515 U.S. 472, 481-82 (1995) (noting that many prison regulations are designed to "guide correctional officers in the administration of a prison" and that "such regulations are not designed to confer rights on inmates); *United States v. Caceres*, 440 U.S. 741, 751-52 (1979) (explaining that mere violations of agency regulations do not raise constitutional questions); *Magluta v. Samples*, 375 F.3d 1269, 1279 n.7 (11th Cir. 2014) (noting "procedural requirements set out in [an administrative] regulation are not themselves constitutional mandates"); *Hilderbrandt v. Butts*, 550 F. App'x 697, 700 (11th Cir. 2013) (finding that plaintiff's due process claim "misse[d] the mark by equating state-law administrative procedures with constitutional due process. Federal due process does not require that state prison officials strictly comply with administrative regulations . . . ."); *Fischer v. Ellegood*, 238 F. Appx. 428, 431 (11th Cir. 2007) (holding that plaintiff's claim alleging defendant violated an internal jail policy was insufficient to survive summary judgment).

By the same rationale, an allegation of non-compliance with the SRO Agreement or BIP is not, in itself, sufficient to give rise to a constitutional violation. Any allegations against Moncada and Moseley regarding a failure to follow policies and procedures detailed in the SRO Agreement and/or the BIP do not support a valid cause of action for a constitutional violation against them. Only the Fourth Amendment would.

## VI.   <u>Excessive Use of Force Under § 1983.</u>

The Fourth Amendment generally protects against the use of excessive force, and claims "that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395.   Determining "reasonableness" requires looking at the totality of the circumstances and evaluating what would be objectively reasonable for an officer on the scene faced with the particular circumstances of that seizure. *Id.* at 396-97.  Factors to consider when evaluating reasonableness include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, whether he is actively resisting or attempting to evade arrest by flight, the need for the force to be applied, the amount of force applied in light of the nature of the need, and the severity of the injury. *See, id.* at 396; *Patel v. City of Madison, Ala.*, 959 F.3d 1330, 1339 (11th Cir. 2020) (citing *Lee*, 284 F.3d at 1197-98); *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019).

The Eleventh Circuit has discussed "whether to apply a standard for excessive force specific to schools." *J.I.W. by and through T.W. v. Dorminey*, 21-12330, 2022 WL 17351654, at *4 (11th Cir. Dec. 1, 2022) (examining standards promulgated by the Supreme Court in *Graham v. Connor* and *New Jersey v. T.L.O.*).[3] In *T.L.O.*, the Supreme

---

[3] The Eleventh Circuit has applied this standard to a students' unlawful detention claim against a school resource officer. *See Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1304 (11th Cir. 2006) (applying the reasonableness standard articulated by *T.L.O.* to school seizures by

Court held that the "legality of a *search* of a student should depend simply on the reasonableness, under all the circumstances, of the search." *T.L.O.*, 469 U.S. 325, 341 (1985) (emphasis added). The Supreme Court explained that the reasonableness of a search was a two-part inquiry: (1) whether the action was justified at its inception; and (2) whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.*

While the Eleventh Circuit in *J.I.W.* declined to address which standard applies to a school resource officer's use of force in the school setting – the standard Fourth Amendment inquiry or some specialized standard for schools based on *TLO* -- the court noted that "[b]oth standards consider the initial justification for the force and measure the officer's actions against that needed," and adopted the two-part test of *T.L.O.*, utilizing *Graham* as guiding analysis when necessary. *Id.* at *5.[4]

The Eleventh Circuit applied the customary Fourth Amendment reasonableness standard to a claim of excessive force by a middle school student whose face was grabbed by an officer who then slammed the student to the ground. *Richmond v. Badia*, 47 F.4th 1171 (11th Cir. 2022). The court affirmed a denial of qualified immunity in that case because the use of force served no legitimate law enforcement purpose and represented "unprovoked force against a non-hostile and

---

law enforcement officers). However, in that case, the Eleventh Circuit did not reach the student's excessive force claim. *Id.* at 1304, n.6.

[4] The Eleventh Circuit in *J.I.W.* noted that other circuit courts of appeal "do not expressly apply *T.L.O.* to excessive force claims." *J.I.W.*, 2022 WL 17351654, at *4-5 (comparing cases from the Fourth, Tenth, and Ninth Circuit Courts of Appeal).

non-violent suspect who ha[d] not disobeyed instructions…" *Id.*, at 1182 (citing *Fils v. City of Aventura*, 647 F.3d 1272, 1289 (11th Cir. 2011)).   This is distinguishable from the instant case in which Plaintiff had engaged in a series of violent acts.   Plaintiff was not slammed to the ground; rather, handcuffs were placed on him to gain control of the situation, which was certainly a legitimate law enforcement purpose under the circumstances.   These are the sorts of factual differences that matter for qualified immunity purposes.

Handcuffing is a *de minimis* use of force.   *See Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (noting that the Court has applied the "de minimis force principle" to handcuffing and granted qualified immunity in several cases).   "Painful handcuffing, without more, is not excessive force in cases where the resulting injuries are minimal."   *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (citing *Nolin v. Isbell*, 207 F.3d 1253, 1257-58 (11th Cir. 2000)).   The Eleventh Circuit has noted in cases where the Court held "that force used to carry out handcuffing was excessive, we have expressly acknowledged the plaintiff's lack of resistance."   *J.I.W.*, 2022 WL 17351654, at *6 (citing *Smith v. Mattox*, 127 F.3d 1416, 1419-20 (11th Cir. 1997)).

**VII.**   **The claim against Moncada for excessive use of force under § 1983 is due to be dismissed.**

Count I is a claim against Moncada for excessive use of force under 42 U.S.C. § 1983.   (Doc. 38, ¶ 30-32).   Plaintiff alleges that "Defendant Moncada's direction to have Defendant Moseley handcuff [Plaintiff] and the resulting use of force toward [Plaintiff] was objectively unnecessary and unreasonable for Moncada to defend

herself or any other person from bodily harm during the detention of [Plaintiff]", constituting a Fourth and Fourteenth Amendment violation. (*Id.*, ¶ 31). Plaintiff further alleges that Moncada acted willfully, wantonly, and maliciously. (*Id.*, ¶ 32).

Plaintiff fails to state a claim against Moncada for § 1983 excessive use of force. Plaintiff does not allege that Moncada had any personal or physical involvement in the alleged excessive use of force against him. (*Id.*, ¶¶ 21-29, 31). The bodyworn camera footage demonstrates Moncada assisted Moseley as he was placing the handcuffs by taking Plaintiff's left arm. (Doc. 22, Moncada BWC, 09:56:49 – 09:57:03).

This use of force by Moncada in assisting Moseley with handcuffing Plaintiff does not rise to the level of a constitutional violation. This was a *de minimis* use of force by Moncada. As Moseley went to place handcuffs on Plaintiff, Moncada assisted by taking hold of Plaintiff's left arm. (*Id.* at 06:56:53 – 09:57:03). Moseley was able to place the handcuffs first on Plaintiff's right wrist, then Plaintiff's left wrist. (*Id.*). The entirety of Moncada's involvement in handcuffing Plaintiff is captured in a ten-second segment on the bodyworn camera footage and does not establish that Moncada violated Plaintiff's constitutional rights.

Even if we consider the standard articulated in *T.L.O.* to determine "reasonableness", Moncada's actions were both justified at its inception and reasonably-related in scope to the circumstances which justified the use of force in the first place. Plaintiff had demonstrated that he was a threat to himself, Moncada, Moseley, and to school employees by *repeatedly* throwing objects at them all. That

Plaintiff may have a behavioral problem that was an underlying cause of his behavior, that does not change the fact that, objectively, an officer could reasonably believe that Plaintiff's violence represented a threat which needed to be brought under control. Moncada's use of force—assisting Moseley in placing handcuffs on Plaintiff by taking hold of Plaintiff's arm—was reasonably-related in scope to the circumstances justifying the use of force in the first place.

Regarding the second prong of the qualified-immunity analysis, Plaintiff would have to cite relevant precedent that would have provided Moncada fair notice that her conduct would violate the Fourth Amendment in these circumstances. The *de minimis* force used in this case does not rise to the level of so-obviously violating the constitution that prior case law is unnecessary. Plaintiff would have to cite a "materially similar case" in which the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court had established that Moncada's conduct clearly violated the Fourth Amendment.

At best, Plaintiff has put forward the SRO Agreement and the BIP, which do not establish a constitutional violation, much less a clearly-established one. Plaintiff has not shown that clearly-established law at the time of the challenged conduct put Moncada on notice that her conduct violated the Constitution. Considering the facts alleged in the Amended Complaint, along with Moncada's bodyworn camera footage which has been incorporated by reference by Plaintiff, Plaintiff has fallen short and has failed to allege sufficient facts to overcome Moncada's entitlement to qualified immunity.

The claim against Moncada should be dismissed with prejudice.

**VIII.**  **The claim against Moseley for excessive use of force under § § 1983 is due to be dismissed**.

Count II is a claim against Moseley for excessive use of force under 42 U.S.C. § 1983.  (Doc. 38, ¶ 33-35).  Plaintiff alleges that "Defendant Mosely [sic] handcuff [sic] [Plaintiff] and the resulting use of force toward [Plaintiff] was objectively unnecessary and unreasonable for Moseley to defend himself or any other person from bodily harm during the detention of [Plaintiff]."  (*Id.*, ¶ 34).  Plaintiff further alleges that Moseley acted willfully, wantonly, and maliciously.  (*Id.*, ¶ 35).

Similar to Plaintiff's claim against Moncada, the use of force by Moseley does not rise to the level of a constitutional violation.   Considering the factors in determining "reasonableness" and whether Moseley's use of force was objectively reasonable, Moseley's placement of handcuffs on Plaintiff does not rise to the level of a constitutional violation.  Plaintiff posed a threat to the safety of Moncada, Moseley, school employees, and even himself, as demonstrated by the bodyworn camera footage.  Plaintiff threw several items at school employees and the officers, in addition to kicking school employees as they attempted to deescalate the situation.  Plaintiff even began kicking Moseley as he was being placed in handcuffs.

As demonstrated by the bodyworn camera footage, Moseley placed his hands on Plaintiff, after he was placed in handcuffs, to prevent Plaintiff from harming himself, the officers, or school employees.  Plaintiff continued attempting to remove his handcuffs after they were placed on his wrists.  Given Plaintiff's behavior, the

amount of force applied to Plaintiff was objectively well within the bounds of reasonableness and was proportional to the needs at the time.   These actions by Moseley do not rise to the level of a constitutional violation.

Even considering the *T.L.O.* standard in determining "reasonableness," Moseley's actions were justified at their inception and reasonably related in scope to the circumstances which justified the use of force in the first place.   Plaintiff had become a threat to himself, Moncada, Moseley, and school employes by throwing objects at them and attempting to kick them.

The *de minimis* force used in this case does not rise to the level of so-obviously violating the Constitution that prior case law is unnecessary.   In order to satisfy the second prong of his burden to defeat qualified immunity, Plaintiff would need to cite a materially similar case in which the Supreme Court, the Eleventh Circuit, or the Florida Supreme Court had established under similar circumstances that Moseley's conduct violated the Fourth Amendment.   Plaintiff, again, has failed to meet his burden in overcoming qualified immunity.   The SRO Agreement and the BIP  do not define a constitutional violation, much less a clearly-established one.

Similar to Moncada, and considering the facts alleged in the Amended Complaint along with Moncada's bodyworn camera footage which has been incorporated by reference by Plaintiff, Plaintiff has failed to allege sufficient facts to overcome Moncada's entitlement to qualified immunity.

The excessive force claim against Moseley should be dismissed with prejudice.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this <u>23rd</u> day of April 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will also serve notice via electronic mail to the following:    Andrew M. Moss, Esq., *moss@krmlegal.com*, Kutner, Rubinoff & Moss, LLP, 2665 South Bayshore Drive, Suite 301, Coconut Grove, Florida 33133, and Donovan A. Roper, Esq., *donroper@roperandroper.com*, Roper & Roper, P.A., 116 N. Park Avenue, Apopka, Florida 32703.

*s/ Ana Cristina Cuello*
THOMAS W. POULTON, ESQ.
Florida Bar No.:  0083798
*poulton@debevoisepoulton.com*
ANA CRISTINA CUELLO, ESQ.
Florida Bar No.: 1010406
*cuello@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida  32792
Telephone:   407-673-5000
Facsimile:    321-203-4304
*Attorneys for Defendants*
*Moseley and Moncada*
